**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ESTATE OF ARLENE SEARS, by Its Special Administrator; and ESTATE OF ELIZA R. THORNE, by Its Special Administrator,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>U.S. BANK, N.A.; WELLS FARGO BANK, N.A.; VIDA CAPITAL INC.; VIDA CAPITAL, LLC; OBRA CAPITAL, INC.; VIDA MANAGEMENT I, LLC; VIDA CAPITAL MANAGEMENT, LLC; VIDA LONGEVITY FUND, L.P.; VICOF II TRUST; and VICOF III TRUST,<br><br>　　　　　Defendants. | C.A. No. |

**COMPLAINT**

Plaintiffs, the Estate of Arlene Sears, by its Special Administrator (petition pending) (the "Sears Estate") and the Estate of Eliza R. Thorne, by its Special Administrator (petition pending) (the "Thorne Estate," and, collectively, "Plaintiffs" or the "Estates"), file and assert this Complaint against Defendants, U.S. Bank, N.A. ("U.S. Bank") and Wells Fargo Bank, N.A. ("Wells Fargo"), as well as Defendants, Vida Capital Inc.; Vida Capital, LLC; Obra Capital, Inc.; Vida Management I, LLC; Vida Capital Management, LLC; Vida Longevity Fund, L.P.; VICOF II Trust; and VICOF III Trust (collectively, "Vida," and jointly with U.S. Bank and Wells Fargo, "Defendants"), and in support thereof, allege and say:

**INTRODUCTION**

1.　　This action involves at least two stranger-originated life insurance ("STOLI") policies, which, upon information and belief, were manufactured in and under Delaware law on the lives of Arlene Sears (the "Sears Policy") and Eliza R. Thorne (the "Thorne Policy," and,

collectively, the "Policies"), in violation of Delaware's Constitution, insurable interest laws, and public policy.

2.      The Policies were originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million dollar STOLI policies, including the Policies here.

3.      Arlene Sears and Eliza R. Thorne (jointly, the "Insureds") have now passed away, and on information and belief, the proceeds of the Policies have been paid by the life insurers to Defendants as the record owners and beneficiaries of the Policies.

4.      However, according to Delaware's long-standing common law, as clearly codified by Delaware statute, and as confirmed recently by multiple courts including the Delaware Supreme Court, the Estates are entitled to require Defendants to disgorge to the Estates the proceeds of the Policies that were paid to Defendants by the life insurers, together with substantial pre-judgment interest. *See* 18 Del. C. § 2704(b); *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital LLC*, No. 18-cv-02002-SB, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (on remand, district court awarding, on summary judgment, the policy's death benefit to family of insured, plus substantial pre-judgment interest); *see also Estate of Malkin v. Wells Fargo Bank, N.A., et al.*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin*") (affirming district court decision finding on summary judgment that identically-procured Coventry policy was a void *ab initio* human life wager, and certifying remaining questions to Delaware Supreme court, which

2

confirmed that estate of insured was entitled to policy proceeds, in *Wells Fargo Bank, N.A., et al. v. Estate of Malkin*, 278 A.3d 53 (Del. 2022)).

## PARTIES

5.      Plaintiff the Sears Estate is a citizen of California because Arlene Sears was a citizen of California at the time of her death. Ms. Sears's son, Howard Sears (a citizen of California), has petitioned the appropriate probate court to be formally appointed as Special Administrator of the Sears Estate.

6.      Plaintiff the Thorne Estate is a citizen of California because Eliza R. Thorne was a citizen of California at the time of her death. Ms. Thorne's daughter, Catlan T. Brinsley (a citizen of California), has petitioned the appropriate court to be formally appointed as Special Administrator of the Thorne Estate.

7.      Defendant U.S. Bank is a national banking association organized and existing under federal law with its main office located in Ohio. U.S. Bank is therefore a citizen of Ohio for purposes of diversity jurisdiction. U.S. Bank is named as a party to this action because, as set forth below, it was the owner and beneficiary of the Sears Policy and received the death benefit proceeds of the Sears Policy from the insurance company that issued it.

8.      Defendant Wells Fargo is a national banking association organized and existing under federal law with its main office located in South Dakota. Wells Fargo is therefore a citizen of the State of South Dakota for purposes of diversity jurisdiction. Wells Fargo is named as a party to this action because, as set forth below, it was the owner and beneficiary of the Thorne Policy and received the death benefit proceeds of the Thorne Policy from the insurance company that issued it.

9.     Defendant Vida Longevity Fund, L.P. ("VLF") is a limited partnership organized under the laws of Delaware. On information and belief formed after reasonable inquiry, VLF is a citizen of Delaware and Texas, and is not a citizen of California.

10.     Defendant Vida Management I, LLC (the "General Partner") is a Delaware limited liability company, and is the General Partner of VLF. On information and belief formed after reasonable inquiry, Vida Management I, LLC is a citizen of Delaware and Texas, and is not a citizen of California.

11.     Defendant Vida Capital Management, LLC ("Vida Management") is the control person of the General Partner. Vida Management is a Delaware limited liability company registered as an investment advisor with the Securities and Exchange Commission. On information and belief formed after reasonable inquiry, Vida Management is not a citizen of California.

12.     Defendant Vida Capital, Inc. ("Vida Inc.") is the control person of Vida Management. Vida Inc. is a Delaware corporation with its principal place of business in Texas, and is therefore a citizen of Delaware and Texas.

13.     Defendant Vida Capital, LLC ("Vida Capital") is a Delaware limited liability company and is the sole owner of Vida Inc. On information and belief formed after reasonable inquiry, Vida Capital is not a citizen of California.

14.     Defendant Obra Capital, Inc. (f/k/a Vida Capital, Inc.) ("Obra Capital") is the successor entity to Vida Inc. It is a Delaware corporation with its principal place of business in Austin, Texas, and is therefore a citizen of Delaware and Texas.

15.     Defendant VICOF II Trust ("VICOF II") is a Delaware statutory trust. The trustee of VICOF II is Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo Trust"). VICOF II is

beneficially owned by a corporation that is a citizen of Delaware and Texas, and is therefore itself a citizen of Delaware and Texas, and is not a citizen of California.

16.     Defendant VICOF III Trust ("VICOF III") is a Delaware statutory trust. The trustee of VICOF III is Wells Fargo Trust. On information and belief formed after reasonable inquiry, VICOF III is a citizen of Delaware and Texas, and is not a citizen of California.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiffs, citizens of California, and the Defendants, which, on information and belief formed after reasonable inquiry, are not citizens of California.

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Delaware.

## BACKGROUND

19.     This action concerns life insurance policies controlled by and subject to Delaware law, including because the Policies were Delaware trust-owned life insurance policies as defined in Delaware's insurable interest statute, 18 Del. C. § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." *Id.* at § 2704(e)(4). The Delaware insurable interest statute further provides that a trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." *Id.* at § 2704(e)(4), (g). Notably, here, on information and belief, the Policies were issued for delivery to, respectively, the Arlene Sears Insurance Trust and the Eliza Thorne 2005 Insurance Trust (jointly, the "Trusts"), both of which are Delaware statutory trusts, in Delaware, and were signed for by,

on information and belief, as the trustee of each, Wilmington Trust Company ("Wilmington Trust"), which has its principal place of business in Delaware.

20.     As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement and public policy, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

21.     Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

22.     It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

23. One such STOLI promoter was a family of interrelated Delaware entities known generally as Coventry, which operated an extremely large Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

24. Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

25. The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

26. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured and paid for by third parties without an insurable interest in the insureds.

27. STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds—into cash machines whereby strangers to the insureds are more interested in seeing those insureds dead than alive.

28.     In most jurisdictions, including Delaware, when these stranger investors get paid on illegal human life wagering STOLI policies, the estates of the insureds have a right to require the investors to disgorge the policy proceeds to those estates.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

29.     The role of Coventry, U.S. Bank, and Wells Fargo in connection with the origination, maintenance, and/or maturation of the Policies dates back many years.

30.     Beginning in 2001, Coventry, U.S. Bank, and Lavastone Capital LLC (which was formerly known as AIG Life Settlements LLC and is referred to herein as "Lavastone") entered into a series of requirements contracts through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with U.S. Bank serving in various roles, including as trustee, fiscal agent, and/or securities intermediary (the "U.S. Bank Origination Agreements").[1] Beginning in or about 2008, Coventry, Wells Fargo, and Lavastone entered into a series of requirements contracts that were effectively identical to the U.S. Bank Origination Agreements and through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with Wells Fargo serving in various roles including as trustee, fiscal agent, and/or securities intermediary (the "Wells Fargo Origination Agreements").

31.     More specifically, pursuant to the U.S. Bank Origination Agreements and the Wells Fargo Origination Agreements (collectively, the "Origination Agreements") and related contracts, Coventry, as the "Originator," was obligated to create large numbers of life insurance policies that (subject to certain exceptions that rarely applied) Lavastone was required to purchase from

---

[1] Lavastone is an affiliate of the American International Group (often referred to as "AIG").

Coventry. Lavastone's purchase from Coventry would, in all or virtually all cases, be facilitated by U.S. Bank or Wells Fargo, which as noted served in many different roles, including as trustee of various trusts and/or as fiscal agent, and as securities intermediary for Coventry, Lavastone, and other investors.

32. To manufacture such life insurance policies intended for transfer on the secondary life insurance market, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

33. Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

34. Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

35. Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, Lavastone, and U.S. Bank or Wells Fargo.

36.     Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how profitable to Coventry and its cohorts a particular policy (if procured) might be.

37.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

38.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

39.     Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and

assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

40.     With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

41.     Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

42.     The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

43.     The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate

trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

44.    Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

45.    But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy— could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the Origination Agreements (which, on information and belief, is what occurred in the majority of Coventry's transactions) and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the Origination Agreements) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by the Coventry through the Origination Agreements ended up, in almost all instances, on the secondary life insurance market, just as intended, and usually with

Coventry (and then Lavastone and then others) as the investors, with U.S. Bank or Wells Fargo as the owners and beneficiaries, and with the investors either keeping the policies until maturity or reselling them to yet other investors.

46.    Coventry and others were often also engaged by Lavastone or other investors to "service" each policy until the insured died, which required that Coventry or these others pay ongoing policy premiums on behalf of the policy's actual owner, and Coventry or these others would contact the insured or her family on a regular basis to confirm whether the insured had died yet. Once Coventry or these others learned an insured had died, they would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

47.    The Delaware Supreme Court in *Price Dawe* recognized that policies created using this same type of two-year non-recourse premium finance scheme—which is what Coventry orchestrated here—are STOLI and thus void *ab initio*. 28 A.3d at 1070-71, n.27 (citing Martin, *Betting on the Lives of Strangers*, 134 U. Pa. J. Bus. L. at 175 (explaining that STOLI exists where a trust is used to own the policy and the interests in the trust are transferred to an investor at the end of a two-year loan)); *id.* at n.32 (citing *Spin-Life Insurance Policies: A Dizzying Effect on Human Dignity and the Death of Life Insuranc*e, 7 Ave Maria L. Rev. 605, 606, 622-24 (2009) (explaining that STOLI includes two-year loans where "the loan amount, interest, and fees imposed by the investors are high enough that the applicant is forced to accept the offers made by the investors and transfer ownership of the policy")).

48.    Since at least 1914, Delaware law has followed the United States Supreme Court's decision in *Warnock v. Davis*, 104 U.S. 775 (1881). *See Balt. Life Ins. Co. v. Floyd*, 91 A. 653, 656 (Del. 1914) ("Where a third party, without any insurable interest in the life of another, procures a policy of insurance on the life of such person, either by having a policy issued directly to himself,

or by having the person whose life is insured take out a policy to himself, and then assign it, these facts, as is held in *Warnock v. Davis* [104 U.S. 775, 26 L. Ed. 924], conclusively show that the transaction is a mere speculation on the life of another, and as such is contrary to public policy, and therefore void.").

49.     Although dating back to 1881, *Warnock* involved a stranger-originated, premium-financed life insurance policy where an insured was induced to apply for a policy that was paid for by an entity known as the Scioto Trust Association. In exchange, the trust promised that when the insured died, one tenth of the policy's death benefit would be paid to his wife. After the insured passed, the Court held that the policy was a mere wager on the life of the insured.

50.     Not surprisingly, therefore, every court that has considered Coventry's two-year, non-recourse premium finance scheme under Delaware law has held, as a matter of law, that: (i) the Coventry program was a STOLI program; and (ii) policies produced by that program are void *ab initio*. *See, e.g.*, *Sun Life v. U.S. Bank*, No. 14-CIV-62610, 2016 WL 161598, at \*10-13 (S.D. Fla. Jan. 14, 2016), *aff'd*, 693 F. App'x 838 (11th Cir. June 12, 2017) ("*Malkin*"); *U.S. Bank v. Sun Life*, No. 14-4703, 2016 WL 8116141, at \*12-14 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *adopted in full*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 609 (D. Del. 2019) ("*Sol*").

51.     On November 16, 2021, in *Estate of Berland I*, the Delaware Supreme Court issued a unanimous *en banc* decision, which involved certified questions of law arising out a Coventry-procured life insurance policy. 266 A.3d at 970-74. In that decision, the Delaware Supreme Court held clearly that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes in force." *Id*. at 968.

52.     In so holding, the Delaware Supreme Court reaffirmed its prior unanimous, *en banc* decision in *Price Dawe*, which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can "never" be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 266 A.3d at 1068 n.25, 1071.

53.     In *Estate of Berland I*, the Delaware Supreme Court also confirmed that, when a life insurance company pays on a STOLI policy that lacks an insurable interest, then the estate of the insured is entitled to sue the payee to require disgorgement of the policy proceeds, plus substantial prejudgment interest. 266 A.3d at 970-74; *see also Estate of Berland II*, 2022 WL 15023450.

54.     On May 27, 2021, in *Estate of Malkin*, the Eleventh Circuit Court of Appeals explained (like so many other courts previously) that Delaware law maintains strict constitutional, statutory, and common law prohibitions on STOLI, and then ruled that the Coventry policy at issue was void *ab initio* as human life wager. *See Estate of Malkin*, 998 F.3d at 1193-99.

55.     On May 26, 2022, after the Eleventh Circuit Court of Appeals certified additional questions, the Delaware Supreme Court, in yet another unanimous *en banc* decision, confirmed that, if a life insurance policy governed by Delaware law (like the Coventry policy at issue in *Estate of Malkin*) is deemed to be a void *ab initio* human life wager, whatever policy proceeds were paid to the investor must be disgorged to estate of the insured as a matter of Delaware's "longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit," pursuant to Section 2704(b) of

Delaware's insurable interest statute, which codified that common law cause of action and provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Estate of Malkin*, 278 A.3d at 60-61 (quoting Section 2704(b)).

56.     The Delaware Supreme Court further held, *inter alia*, that various UCC defenses do not apply in the context of insurable interest claims, and further explained that a defendant in such a case is allowed to obtain a credit for premiums only under limited circumstances. *Id.* at 56, 60, 63-67.

## The Application and Issuance of the Sears Policy

57.     In or around 2005, Transamerica Life Insurance Company ("Transamerica") received an application for life insurance (the "Sears Application") seeking a universal life insurance policy on the life of the Ms. Sears, who was then 71 years old.

58.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Sears Application identified the owner and beneficiary of the proposed policy as the Arlene Sears Insurance Trust (the "Sears Trust").

59.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Sears Application identified the Sears Trust as a Delaware trust, formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

60.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Sears Application was signed by a financial services officer for Wilmington Trust, as trustee of the Sears Trust and owner and beneficiary of the purported policy.

16

61.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Sears Application was signed in Wilmington, Delaware.

62.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in reliance upon the representations contained in the Sears Application, and other documents and information submitted to Transamerica in connection with the Sears Application, Transamerica issued the Sears Policy, bearing policy number 60128761.

63.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica received a policy delivery receipt executed by a financial services officer for the trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

## The Application and Issuance of the Thorne Policy

64.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in or around 2005, American General Life Insurance Company (which is an affiliate of AIG and is referred to herein as "AIG") received an application for life insurance (the "Thorne Application") seeking a universal life insurance policy on the life of Ms. Thorne, who was then 70 years old.

65.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Thorne Application identified the owner and beneficiary of the proposed policy as the Eliza Thorne 2005 Insurance Trust (the "Thorne Trust").

66.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Thorne Application identified the Thorne Trust as a Delaware trust, formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

67.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Thorne Application was signed in Wilmington, Delaware, by a financial services officer for Wilmington Trust, as trustee of the Trust and owner and beneficiary of the purported policy.

68.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in reliance upon the representations contained in the Thorne Application, and other documents and information submitted to AIG in connection with the Thorne Application, AIG issued the Thorne Policy, bearing policy number UM0045298L and a death benefit of $6,250,000.

69.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, AIG received a policy delivery receipt executed by a financial services officer for the trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

**The Policies Were Procured and Used as Illegal Wagers on the Life of the Insureds**

70.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policies lacked an insurable interest at their inception, and they were procured as illegal wagers on the lives of the Insureds as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions on wagering. Any appearance of insurable interest was superficial only and was in reality designed to conceal the true wagering nature of the purported Policies.

71.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the initial funds for the Policies' premium payments were either provided to the Insureds by a third party with no insurable interest in their lives, or were fronted by the Insureds with the understanding that they would soon afterwards be reimbursed. Any and all subsequent premiums were paid by Coventry and/or other persons or entities who lacked an

insurable interest in the Insureds' lives and were participating in a wager on their lives. Thus, at no point were the Insureds at risk that their own funds would be used to pay premiums on the Policies.

72.     To induce the Insureds to allow the Policies to be procured on their lives, Coventry and those acting on its behalf may have represented that the Policies were being procured through a legitimate and legal transaction, or further induced the Insureds with the promise of financial compensation if they permitted the Policies to be procured.

73.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry acted through its agent(s) to have applications for the Policies submitted to the insurance companies that ultimately issued the Policies.

74.     To facilitate this transaction, Coventry created the Trusts as Delaware trusts, installed Wilmington Trust as the trustee of the Trusts, and used the Trusts as a cover to procure the Policies without a valid insurable interest.

75.     The Trusts were shams and used as covers because, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, they were nominally funded and created as a means to conceal from the insurance carriers the fact that they were being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trusts lacked any valid insurable interest in the Insureds' lives.

76.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry further created sub-trusts to the Trusts. The sub-trusts were also established as mere covers to procure the Policies without a valid insurable interest.

77.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policies insuring the lives of the Insureds were issued and delivered in Delaware to the Trusts, as described above.

78.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in connection with originating the Policies, Coventry, acting through LaSalle Bank, N.A., entered into non-recourse "loan" arrangements with the Trusts, with the Policies serving as the sole collateral for the purported "loans."

79.     The purported "loans" were secured solely by security interests in the Trusts and sub-trusts that held the Policies.

80.     As a result of the purported "loans," neither the Insureds nor anyone with an insurable interest in their lives ever paid any premiums on the Policies. Rather, the loans were used to conceal from the insurance carriers the fact that such premiums were paid by Coventry for the purpose of creating wagers on the Insureds' lives.

81.     Moreover, the purpose of the Policies was not to provide estate protection for the Insureds, but rather, the Insureds were used as instrumentalities to procure the Policies so that strangers with no insurable interest could wager on the Insureds' early demise.

82.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Sears Policy was issued, stranger investors unrelated to Ms. Sears took formal control of the Sears Policy, and, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, U.S. Bank was installed as securities intermediary, trustee, or other agent acting on behalf of Coventry, Lavastone, or subsequent investors with no insurable interest in the life of Ms. Sears.

83.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Thorne Policy was issued, stranger investors unrelated to Ms. Thorne took formal control of the Thorne Policy, and, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Wells Fargo was installed as securities intermediary, trustee, or other agent acting on behalf of Coventry, Lavastone, or subsequent investors with no insurable interest in the life of Ms. Thorne.

84.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, none of this was disclosed to the insurance carriers. Instead, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, those seeking to procure the Policies, by design, disguised the true wagering nature of the Policies, and took steps after issuance of the Policies so as to further and continually conceal from the insurance carriers the true wagering nature of the transactions.

85.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as part of the illegal wagering scheme, Coventry and the other individuals and/or entities acting in concert with each other to generate the Policies misrepresented and otherwise concealed from the insurance carriers that, from the outset, the Policies were never intended to benefit anyone with an insurable interest in the Insureds' lives, but were instead instruments allowing stranger investors to gamble on their lives.

86.     As noted, since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. However, since at least 2016— before the Insureds passed away and U.S. Bank and Wells Fargo sought the Policies' death benefits here—U.S. Bank and Wells Fargo knew or should have known that the Policies lacked insurable

interest. Yet, U.S. Bank and Wells Fargo continued to pay premiums anyway and collected the proceeds of the Policies anyway.

87.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, U.S. Bank, Wells Fargo, Vida, and their agents repeatedly invaded the Insureds' privacy and that of their families by contacting the Insureds and their families frequently to determine whether the Insureds were still alive and, if so, to check on the status of the Insureds' health.

88.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, U.S. Bank, Wells Fargo, Vida, and their agents further invaded the Insureds' privacy by procuring the Insureds' confidential medical records on a regular basis, and then providing those records to third parties to obtain up-to-date life-expectancy reports so as to assess the current value of their wagers, as well as to allow potential purchasers to assess the value of the Policies based on when these strangers believed the Insureds would die.

89.     Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

90.     On February 16, 2022, Ms. Thorne passed away; on November 7, 2022, Ms. Sears passed away.

91.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the insurance carrier subsequently received a claim for the Sears Policy's death benefits by or on behalf of U.S. Bank.

92.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the insurance carrier subsequently paid the Sears Policy's death benefit proceeds to U.S. Bank.

93.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the insurance carrier subsequently received a claim for the Thorne Policy's death benefit by or on behalf of Wells Fargo and/or Vida.

94.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the insurance carrier subsequently paid the Thorne Policy's death benefit proceeds to Wells Fargo and/or Vida.

### COUNT I
### RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST
### (AGAINST U.S. BANK)

95.     The Sears Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

96.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Sears Policy was applied for and signed for in Delaware by a Delaware statutory trust, as owner and beneficiary of the Sears Policy. The Sears Policy was then actually delivered to the trustee of the Sears Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Sears Policy is governed by Delaware law. 18 Del. C. § 2704(e)(4), (g).

97.     The Delaware insurable interest statute provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or

her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 Del. C. § 2704.

98.     The Delaware Supreme Court has clarified that this insurable interest requirement is not satisfied where a third party without an insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *Price Dawe*, 28 A.3d 1059.

99.     Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits as a matter of common law and statute. 18 Del. C. § 2704 (b). *See, e.g.*, *Estate of Malkin*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019).

100.     The Sears Policy was procured or caused to be procured without insurable interest as wager on the life of Ms. Sears using Coventry's standard Delaware-centered STOLI scheme.

101.     Regardless of whether Ms. Sears knew the details of this scheme, her identity was merely used as an instrumentality to procure the Sears Policy, and as set forth above, stranger investors were wagering on the life of Ms. Sears and hoping to trigger a secondary market cash-in on the death benefit of the Sears Policy.

102.     The death benefit of the Sears Policy was paid, transferred, or otherwise assigned to U.S. Bank, its principals or agents, or others working in concert with it.

103.     As a consequence, the Sears Estate is entitled to recover those death benefit proceeds (plus applicable interest, attorneys' fees, and other costs and damages) from or through U.S. Bank.

**COUNT II**
**RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE**
**INTEREST**
**(AGAINST WELLS FARGO AND VIDA)**

104.     The Thorne Estate hereby incorporates by reference each and every allegation

contained in the preceding paragraphs as if set forth herein at length.

105.     As will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery, the Thorne Policy was applied for and signed for in Delaware by a

Delaware statutory trust, as owner and beneficiary of the Thorne Policy. The Thorne Policy was

then actually delivered to the trustee of the Thorne Trust, Wilmington Trust, in Wilmington,

Delaware. The Thorne Policy is governed by Delaware law. 18 Del. C. § 2704(e)(4), (g).

106.     The Delaware insurable interest statute provides, among other things, that "no

person shall procure or cause to be procured any insurance contract upon the life or body of another

individual unless the benefits under such contract are payable to the individual insured or his or

her personal representatives or to a person having, at the time when such contract was made, an

insurable interest in the individual insured." 18 Del. C. § 2704.

107.     The Delaware Supreme Court has clarified that this insurable interest requirement

is not satisfied where a third party without an insurable interest uses an insured as an

instrumentality to procure a policy for itself as a wager on the insured's life. *Price Dawe*, 28 A.3d

1059.

108.     Where an insurance company pays the death benefit on a policy lacking insurable

interest, the "executor or administrator" of the insured is entitled to recover such benefits from the

beneficiary, assignee, or payee that received the benefits as a matter of common law and statute.

18 Del. C. § 2704 (b). *See, e.g.*, *Estate of Malkin*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019).

109. The Thorne Policy was procured or caused to be procured without insurable interest as wager on the life of Ms. Thorne using Coventry's standard Delaware-centered STOLI scheme.

110. Regardless of whether Ms. Thorne knew the details of this scheme, her identity was merely used as an instrumentality to procure the Thorne Policy, and as set forth above, stranger investors were wagering on the Ms. Thorne's life and hoping to trigger a secondary market cash-in on the Thorne Policy's death benefit.

111. The Thorne Policy's death benefit was paid, transferred, or otherwise assigned to Wells Fargo and Vida, their principals or agents, or others working in concert with them.

112. As a consequence, the Thorne Estate is entitled to recover those death benefit proceeds (plus applicable interest, attorneys' fees, and other costs and damages) from or through Wells Fargo and Vida.


DATED: April 26, 2024          **COZEN O'CONNOR**

*/s/ Kaan Ekiner*
Kaan Ekiner (#5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
302-295-2046
kekiner@cozen.com

*Attorneys for Plaintiffs*